**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**LISA FRENCH,**

                                        **Plaintiff,**

        **vs.**                                                    **1:22-CV-252**
                                                                    **(MAD/DJS)**
**ALBANY MEDICAL CENTER,**

                                        **Defendant.**

_____

**APPEARANCES:**                          **OF COUNSEL:**

**SLATER SLATER SCHULMAN LLP**        **JOHN C. LUKE, JR., ESQ.**
445 Broad Hollow Road, Suite 419
Melville, New York 11747
Attorney for Plaintiff

**BORRELLI & ASSOCIATES, P.L.L.C.**      **GEOFFREY KALENDER, ESQ.**
910 Franklin Avenue – Suite 205
Garden City, New York 11530
Attorney for Plaintiff

**BOND, SHOENECK, & KING, PLLC**         **ROBERT F. MANFREDO, ESQ.**
22 Corporate Woods Blvd., Suite 501      **MARA DEW AFZALI, ESQ.**
Albany, New York 12211                   **REBECCA JADE LAPOINT, ESQ.**
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On March 15, 2022, Plaintiff Lisa French initiated this action through the filing of a

complaint. *See* Dkt. No. 1. Plaintiff, a previous employee of Defendant Albany Medical Center,

alleges that Defendant discriminated against her on the basis of her religion and retaliated against

her for requesting a reasonable accommodation while employed by Defendant. *See id.* Presently

1

before the Court is Defendant's motion for summary judgment.  *See* Dkt. No. 38.  Plaintiff

responds in opposition, *see* Dkt. No. 39, and Defendant replies.  *See* Dkt. No. 40.

## II. BACKGROUND

Defendant is a level one trauma center and an academic sciences center.  *See* Dkt. No. 39-

1 at ¶ 1.  It "is the only level 1 trauma center in the Capital Region."  *Id.*  It operates as a hospital,

medical school, and charitable foundation.  *See id.*  Rebecca O'Donnell, Defendant's Director of

Epidemiology, declares that Defendant treats some of the sickest and most vulnerable patients as

a level one trauma center.  *See* Dkt. No. 38-21 at ¶ 5; *see also* Dkt. No. 39-1 at ¶ 2.  Sandra

Castilla, Defendant's Vice President and Chief Human Resources Officer, declares that Defendant

is an equal opportunity employer.  *See* Dkt. No. 39-1 at ¶ 3; *see also* Dkt. No. 38-11 at ¶ 5.

Defendant hired Plaintiff on July 27, 2015, as a "Registered Nurse Quality Specialist PD"

in Defendant's Quality Management Department.  *See* Dkt. No. 39-1 at ¶ 4.  Plaintiff was

terminated from her position on March 16, 2018, when she failed to meet her hours requirement.

*See id.* at ¶ 5.  Defendant re-hired Plaintiff on October 15, 2018, as a Utilization Review Nurse

("URN") in Defendant's Case Management and Social Work Department.  *See id.* at ¶ 6.

Defendant asserts that as a URN, "Plaintiff worked in close contact with patients, physicians,

nurses, and other support staff daily in Albany Med's Emergency Department."  *Id.* at ¶ 7.

Plaintiff does not deny that she had "close contact" with those individuals but avers "that she had

limited contact with surgeons and patients."  *Id.*

In Plaintiff's deposition, she testified that her "primary area was the emergency

department.  If [her] coworker needed help, it was [her job] to support her, support the staff, the

emergency room physicians and staff, nursing, um, staff, primarily."  Dkt. No. 38-4 at 39.

Plaintiff testified that there were "[v]ery few times" that she interacted with patients but would

interact with them if they were "brought into the hospital as an observation patient." *Id.* at 52. An observation patient was someone who was expected to stay at the hospital for a short time. *See id.* Plaintiff "would . . . let them know that they're insurance company was probably not going to pay for [their stay] or refer them to talk to their insurance company for clarification." *Id.* at 52-53. She would interact with those patients in the Emergency Department and in the patient's room. *See id.* at 53; *see also* Dkt. No. 39-1 at ¶¶ 9-11. Plaintiff testified that she "[r]arely [] had those patients. Um it usually -- the nurses. I'm sorry, the case managers on the floor dealt more with those." Dkt. No. 38-4 at 53. Plaintiff attested in a declaration, submitted nine months after her deposition, that she "had limited contact with doctors and patients. When meeting with staff, [she] was always standing off to the side with [her] mobile workstation." Dkt. No. 39-4 at ¶ 11. Plaintiff's workstation was on wheels which allowed her to move around the Emergency Department to interact with staff and patients. *See* Dkt. No. 39-1 at ¶ 8. She declared that she "mostly sat alone amongst a suite of empty offices above the emergency room." Dkt. No. 39-4 at ¶ 12; *see also* Dkt. No. 39-1 at ¶ 12. She would also work closely with the Emergency Department physicians and attend daily rounds with five-to-six physicians to answer patients' questions about insurance. *See* Dkt. No. 39-1 at ¶ 12. Defendant contends that when she met with staff, they would gather around a desk. *See id.* at ¶ 13. Plaintiff also interacted with bedside nurses. *See id.* at ¶ 14.

Ms. Castilla declared that Defendant maintained the following procedure for requesting a reasonable accommodation: (1) the employee would have to state their religious belief to their manager and identify the work-related directive that interfered with the religious belief; and (2) Defendant would consider the request and grant or deny it. *See* Dkt. No. 38-11 at ¶ 6. Defendant considered whether a request would impact patient or staff safety—a ground upon which a

request could be denied.  *See id.*  Prior to 2019, Defendant did not allow religious exemptions to vaccination requirements for measles, mumps, rubella, or Hepatitis B.  *See* Dkt. No. 38-21 at ¶ 11.

Defendant's vaccination requirements are set forth in its Annual Employee Requirements policy.  *See* Dkt. No. 39-1 at ¶ 19.  The policy explains employees' duties to provide proof of vaccinations.  *See* Dkt. No. 38-13 at 2-3.  The policy also notifies employees that they can be suspended without pay for failure to provide the requisite proof.  *See id.*  If an employee fails to meet the requirement within seven days of suspension, Defendant will terminate the employee. *See id.* at 3.

Prior to May 2019, Defendant's Healthcare Worker Influenza Vaccination Policy required employees to either (1) receive an influenza vaccination; or (2) sign a declination form and wear a mask.  *See* Dkt. No. 39-1 at ¶ 20.  Employees could receive the vaccine for free from Defendant. *See id.* at ¶ 21.  The declination form did not require the employee to explain their reason for declining.  *See id.* at ¶ 22.  If an employee declined, they were required to wear a mask during influenza season.  *See id.* at ¶ 23.

Defendant monitors all cases of influenza in the hospital.  *See id.* at ¶ 25.  During influenza season, the Emergency Department treats influenza patients.  *See id.* at ¶ 24.  When the Emergency Department becomes overcrowded, patients wait in the hallway for treatment.  *See id.* The New York Department of Health requires Defendant to report all cases of influenza that have been acquired in the hospital.  *See id.* at ¶ 25.  These cases are called "nosocomial."  *Id.* Nosocomial cases can begin by health care workers transmitting influenza to patients or other workers.  *See id.*  In 2017, Defendant suffered two "influenza outbreaks": in January, five patients and one healthcare worker acquired influenza in the hospital; and in December, six patients and two health care workers acquired influenza in the hospital.  *Id.* at ¶ 26.  Defendant experienced

4

one "influenza outbreak" in 2018 with two patients acquiring influenza in the hospital.  *Id.* at ¶ 27.

"The Center for Disease Control and Prevention (CDC) estimated that in the 2018-2019 flu

season, approximately 29 million people contracted influenza, with 13 million of those visiting a

health care provider for the illness.  Of those, 380,000 were admitted to the hospital, and 28,000

people died from the virus."  *Id.* at ¶ 28 (citing *Estimated Influenza Illnesses, Medical visits,*

*Hospitalizations, and Deaths in the United States—2018–2019 Influenza Season*, CDC,

https://archive.cdc.gov/#/details?url=https://www.cdc.gov/flu/about/burden/2018-2019.html)).

The CDC represents that vaccination is the best method to prevent influenza and recommends that

healthcare workers receive the vaccine each year.  *See id.* at ¶¶ 29-30.

In 2015 and 2016, Plaintiff received the influenza vaccination.  *See id.* at ¶ 31.  Plaintiff

did not receive the vaccine in 2017 and submitted a declination form to Defendant.  *See id.* at ¶

32.  The form did not note any religious beliefs or reasons for the declination.  *See id.*

Plaintiff became an Israelite in 2018.  *See id.* at ¶ 33; *see also* Dkt. No. 38-4 at 142.

Plaintiff is also an American Indian.  *See* Dkt. No. 38-4 at 125.  She considers Israelite to be a

religious identification.  *See id.* at 130.  When asked whether her vaccination beliefs stem from

being an Israelite or American Indian, Plaintiff testified, "[p]rimarily religion, but I can't separate

who I am, either, from my religion."  *Id.* at 139.

As part of Plaintiff's "beliefs as an Israelite, she observes the Old Testament which

requires her to 'practice health interventions that are exclusively derived from the earth'" and

follows "'several scriptures' that inform her religious beliefs."  Dkt. No. 39-1 at ¶ 34 (quotations

omitted).  Defendant contends that "[o]ther than generally referencing religious scripture, Plaintiff

provided no specific information of how such scripture supports her beliefs."  Dkt. No. 39-1 at ¶

35.  Plaintiff disagrees and states that "[d]uring her deposition[,] Plaintiff pointed to certain

religious texts that highlighted her beliefs." *Id.*  She testified that "with respect to [her] spiritual beliefs as an Israelite" she relies on the Book of Jasher, the Book of Jubilees, and the Old Testament.  Dkt. No. 38-4 at 143-44.  When asked if the Books refer to vaccines, Plaintiff stated that she was "not sure if they had vaccines back then," but they did speak to medical treatment and "healing." *Id.* at 145.  Plaintiff testified that on the basis of her religious beliefs, she "object[s] to all" vaccines.  *Id.* at 137.

The last time she received a vaccine "was probably 2016." *Id.*  Plaintiff explained that her basis for the objection is that "[t]he Most High heals us.  We can -- the pawer [sic] we pray to, um, has provided for plants and animals, as it is explained in the scriptures.  Healing comes from, um -- from following the guidelines of that were given in the Old Testament." *Id.* at 137-38.  Plaintiff meets with a fellowship of individuals of the same faith but does not know whether anyone else objects to or receives vaccinations.  *See* Dkt. No. 39-1 at ¶¶ 37-38.

In 2018, Plaintiff did not get the influenza vaccination and submitted a declination form.  *See id.* at ¶ 39.  She testified that she filled out the declination form in 2018 that the "[t]he declination is the religious accommodation."  Dkt. No. 38-4 at 77.  Plaintiff admitted that the form does not mention religion and she did not add anything to the form about religion.  *See id.* at 62, 77-78.  Plaintiff contends that she "disclosed her religious reasons for not getting the vaccination [to] the [Albany Medical Center] employee administering the vaccination."  Dkt. No. 39-1 at ¶ 39.  Plaintiff also testified that in early 2019, she spoke with her former manager, Amy Valentine, about her religion in terms of needing to have Saturdays off work to observe Shabbat.  *See* Dkt. No. 38-4 at 130-31.  She did not discuss anything about vaccinations.  *See id.* at 131-32.

Defendant maintains an Infection and Control Committee ("ICC").  *See* Dkt. No. 39-1 at ¶ 40.  The Committee reviews employee compliance with Defendant's vaccination policies.  *See*

*id.* During the Committee's January 2019 review, managers and supervisors reported difficulty in monitoring whether unvaccinated employees were appropriately wearing masks. *See id.* at ¶ 41. They also reported reprimanding employees for not properly wearing masks. *See id.* Plaintiff states that she was never reprimanded. *See id.*

The Committee determined that requiring unvaccinated employees to wear masks was not an effective infection control practice. *See id.* at ¶ 43. The Committee considered that vaccination was the most effective way to prevent the spread of influenza and that healthcare facilities across the country were mandating vaccinations. *See id.* at ¶¶ 44-45. Thus, the Committee unanimously voted to recommend that Defendant "adopt a mandatory influenza vaccination policy, allowing exemptions only for medical contraindications." *Id.* at ¶ 46.

Defendant revised its vaccination policy accordingly to mandate the influenza vaccine. *See id.* at ¶ 47. The revised policy went into effect in May 2019 and stated as follows:

> To prevent the transmission of influenza and protect the patients who are at high risk for influenza related complications, an annual seasonal influenza vaccination is required at no charge for all health care workers. All health care workers must be vaccinated, show proof of vaccine (unless medically contraindicated) by the deadline set by the Medical Affairs Office in consultation with Employee Health Services and the Department of Epidemiology for each Influenza season.

*Id.* at ¶ 48. Defendant sent an e-mail to all employees, including Plaintiff, on August 22, 2019, informing them of the new policy and the possibility of suspension without pay and termination for non-compliance by November 12, 2019. *See id.* at ¶ 51. Defendant sent five reminder e-mails in September and October 2019. *See id.* at ¶ 52. Plaintiff's supervisor, Mikaela Estey, also sent an e-mail to Plaintiff to remind Plaintiff that the vaccination was mandatory. *See id.* at ¶ 53. Defendant sent an additional e-mail on November 6, 2019, warning all employees that they must

receive the vaccination by November 12, 2019, and that failure to comply within seven days of that date would result in termination. *See id.* at ¶ 54. On November 7, 2019, Ms. Estey sent another personal e-mail to Plaintiff about the mandate. *See id.* at ¶ 55.

On November 8, 2019, Plaintiff told Ms. Estey that she would not receive the vaccine because it was against her "beliefs." *Id.* at ¶ 56. Plaintiff avers that she "informed Ms. Estey that she wanted a religious accommodation on the telephone. Defendant's human resources never asked her for specifics. They just dismissed her request without a dialogue." *Id.* Defendant contends that Plaintiff did not specify what her beliefs were. *See id.* Defendant states that Ms. Estey informed Plaintiff that the only exemptions were for medical reasons and that failure to comply with the policy would result in suspension and termination. *See id.* at ¶ 57. Plaintiff asserts that "Ms. Estey never informed Plaintiff about any other option. There was no additional dialogue. She just replied, 'Oh that's so sad.'" *Id.* (quoting Dkt. No. 38-4 at 104).

Defendant asserts that "Plaintiff met with Lovelyne Pierre in Albany Med's Human Resources Department and alleged by letter that the influenza vaccination requirement was a violation of a purported employment agreement with Albany Med." *Id.* at ¶ 58. Plaintiff admits that she met with Ms. Pierre but contends that she requested a religious accommodation during the meeting. *See id.* Defendant asserts that "Plaintiff did not ask for a religious exception" or speak with anyone else about her decision not to get vaccinated. *Id.* at ¶ 59.

E-mails provided by Defendant confirm that Plaintiff spoke with Ms. Estey and Mr. Pierre. *See* Dkt. No. 38-15 at 2. On November 8, 2019, Ms. Estey e-mailed the Directors of Human Resources, Ms. Pierre and Mitchel Todd, stating that she "just spoke with [Plaintiff] and [Plaintiff] informed [Ms. Estey] she will not be receiving the flu vaccine. [Ms. Estey] spoke with [Plaintiff] about the consequence of this decision with the initial suspension and then ultimately

8

be terminated and will not be eligible for rehire." *Id.*  "[Plaintiff] understand[s] these consequence[s] and is still staying with her decision." *Id.*  Ms. Pierre responded to the e-mail explaining that Plaintiff "did stop by HR to drop of [sic] a letter stating she will not get the Flu shot[.]  I also explained the consequence." *Id.*  On November 11, 2019, Ms. Estey e-mailed Mr. Todd to "recap" the phone conversation between herself and Plaintiff.  Dkt. No. 38-16 at 2.  In the e-mail, Ms. Estey stated that Plaintiff "mentioned that it goes against her beliefs . . . [Plaintiff] also mentioned that she needs to go with her beliefs and that its against what she believes in." *Id.*

Ms. Estey and Ann Marie Greene, the Case Management Manager, met with Plaintiff on November 13, 2019, and informed Plaintiff of her suspension for failure to receive the vaccine. *See* Dkt. No. 39-1 at ¶ 60.  Ms. Greene issued a corrective action notice and told Plaintiff to let Ms. Greene know if Plaintiff received the vaccine before the compliance deadline. *See id.* at ¶¶ 61-62.

In an e-mail dated November 13, 2019, Ms. Estey explained to Mr. Todd the conversation that occurred when they delivered the corrective action notice to Plaintiff. *See* Dkt. No. 38-17 at 2.  As part of the conversation, Plaintiff "asked if [Ms. Estey] was advised of the paperwork from [Plaintiff's] attorney that [Plaintiff] had given [Ms. Pierre] and that this was against her violation of her rights [sic]." *Id.*  Ms. Greene confirmed the same in a separate e-mail, explaining that Plaintiff "stated she has delivered paperwork to HR for attorney review as this was a violation of her rights." Dkt. No. 38-18 at 2.

On November 15, 2019, Plaintiff attempted to submit a signed declination form. *See* Dkt. No. 39-1 at ¶ 63.  Plaintiff did not receive the vaccine and was terminated on November 20, 2019. *See id.* at ¶ 64.  Ms. Pierre notified Plaintiff of her termination on November 21, 2019. *See id.*

Following imposition of the vaccination requirement, Defendant did not experience an influenza outbreak from 2019 to 2022.  *See id.* at ¶ 67.

### III. DISCUSSION

**A.      Summary Judgment Standard**

"The entry of summary judgment is warranted when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Doane v. United States*, 369 F. Supp. 3d 422, 438 (N.D.N.Y. 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also* FED. R. CIV. P. 56(a).  "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Jennings v. Decker*, 359 F. Supp. 3d 196, 204 (N.D.N.Y. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Doane*, 369 F. Supp. 3d at 438; *Kenney v. Clay*, 172 F. Supp. 3d 628, 635 (N.D.N.Y. 2016).

"'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'"  *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).  However, irrelevant or unnecessary factual disputes do not preclude summary judgment.  *See Anderson*, 477 U.S. at 248.  Only genuine disputes about a material fact, such that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" will preclude summary judgment.  *Id.*

The party moving for summary judgment "bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the

claim." *Doane*, 369 F. Supp. 3d at 438.  If the moving party establishes a prima facie basis for

summary judgment and satisfies their burden, the burden then shifts to the nonmoving party, who

must then "show, through affidavits or otherwise, that there is a material issue of fact for trial"

that a reasonable jury could resolve in its favor.  *Id.*; *see also Kenny*, 172 F. Supp. 3d at 635.

Evidence that is not significantly probative, or "the mere existence of some alleged factual dispute

between the parties[,] will not defeat an otherwise properly supported motion for summary

judgment." *Kenny*, 172 F. Supp. 3d at 635-36 (quoting *Anderson*, 477 U.S. at 247-48); *see also*

*Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) ("Genuine issues of fact are

not created by conclusory allegations").  The nonmoving party must show by more than a

"scintilla of evidence" that "a fact-finder could reasonably find for the non-movant." *Heublein*,

996 F.2d at 1461.  In determining the existence of any genuine disputes of material fact, "a court

must resolve any ambiguities and draw all inferences from the facts in a light most favorable to

the nonmoving party." *Smith v. N.Y.S. Off. of Temp. & Disability Assistance*, 535 F. Supp. 3d 90,

94 (N.D.N.Y. 2021) (quoting *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017)); *see*

*also Jeffreys*, 426 F.3d at 553.

**B.      Reasonable Accommodation**

        "Under Title VII, 'it is an unlawful employment practice "for an employer not to make

reasonable accommodations, short of undue hardship, for the religious practices of [its]

employees and prospective employees."'" *Brooks v. City of Utica*, 275 F. Supp. 3d 370, 379

(N.D.N.Y. 2017) (quoting *Zacharowicz v. Nassau Health Care Corp.*, 177 Fed. Appx. 152, 154

(2d Cir. 2006)) (additional quotation omitted); *see also Trans World Airlines, Inc. v. Hardison*,

432 U.S. 63, 74 (1977).  "The term 'religion' includes 'all aspects of religious observance and

practice, as well as belief.'" *Brooks*, 275 F. Supp. 3d at 379 (quoting 42 U.S.C. § 2000e(j)).

"A failure-to-accommodate claim requires a plaintiff to show that '(1) she held a bona fide religious belief conflicting with an employment requirement; (2) she informed her employer of this belief; and (3) she was disciplined for failure to comply with the conflicting employment requirement.'" *Id.* at 379-80 (quoting *Mines v. City of New York/DHS*, No. 11-CV-7886, 2013 WL 5904067, *7 (S.D.N.Y. Nov. 1, 2013)) (additional citation omitted). "While the Second Circuit 'has never defined "discipline" within the context of the three-pronged religious discrimination test,' several courts in this circuit have equated discipline with 'adverse employment action.'" *Id.* at 380 (quoting *Siddiqi v. N.Y.C. Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 370 (S.D.N.Y. 2008)).

Defendant argues that Plaintiff's religious beliefs are not sincerely held, she did not inform Defendant of her religious beliefs, and that a religious exemption would have imposed an undue hardship. *See* Dkt. No. 38-2 at 5-13. Plaintiff disagrees with each argument. *See* Dkt. No. 39.

### 1. Sincerely Held Religious Beliefs

"'The inquiry as to whether a person's belief is religious is twofold: 'whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious.'" *Balchan v. New Rochelle City Sch. Dist.*, No. 23-CV-06202, 2024 WL 2058726, *6 (S.D.N.Y. May 7, 2024) (quoting *Gardner-Alfred v. Fed. Rsrv. Bank of New York*, 651 F. Supp. 3d 695, 720 (S.D.N.Y. 2023)) (additional citation omitted). "A religious belief is 'sincerely held' when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature." *Burrell v. DOCCS*, 655 F. Supp. 3d 112, 129 (N.D.N.Y. 2023) (quoting *Ford v. McGinnis*, 352 F.3d 582, 590 (2d Cir. 2003)).

"While 'the judiciary is singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs,' . . . courts 'are clearly competent to determine whether religious

beliefs are "sincerely held[.]"'" *Kravitz v. Purcell*, 87 F.4th 111, 127 (2d Cir. 2023) (quoting *Jackson v. Mann*, 196 F.3d 316, 321 (2d Cir. 1999)).  "Such an inquiry is 'largely a matter of individual credibility' rather than an examination of 'applicable religious tenets.'" *Id.* (quoting *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 485-86 (5th Cir. 2014)).  "And the inquiry can dispose of claims that are 'so clearly nonreligious in motivation' as not to merit First Amendment protection." *Id.* (quotation omitted).

Defendant argues Plaintiff "is unable to provide any accompanying evidence that her religious belief is sincere." Dkt. No. 38-2 at 6.  Defendant states that Plaintiff "provided no specifics as to how [] scripture[s] support her beliefs," "could not identify whether any other Israelites subscribed to this belief and rejected vaccinations," and did not mention her beliefs in her letter or forms submitted to Defendant.  *Id.* at 7.  Plaintiff argues that because she testified to having the religious belief, a question of fact exists as to the sincerity of it.  *See* Dkt. No. 39 at 5-6.

To support its argument that Plaintiff's beliefs are not sincerely held, Defendant cites *Gardner-Alfred v. Federal Reserve Bank of New York*.  *See* Dkt. No. 38-2 at 6.  In *Gardner-Alfred*, the court explained that "[a]nalysis of a claimant's sincerity 'seeks to determine an adherent's good faith in the expression of his religious belief,' in order to 'provide[ ] a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud.'" *Gardner-Alfred v. Fed. Rsrv. Bank of New York*, No. 22-CV-1585, 2023 WL 6214863, *13 (S.D.N.Y. Sept. 25, 2023) (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)) (second alteration in original).  "'[T]h[e] analysis is most useful where extrinsic evidence is evaluated.'" *Id.* (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 441 (2d Cir. 1981)) (alterations in original).  "[A]n

adherent's belief [is] not . . . 'sincere' if he acts in a manner inconsistent with that belief . . . or if there is evidence that the adherent materially gains by fraudulently hiding secular interests behind a veil of religious doctrine.'" *Id.* (quotation and citations omitted) (alterations in original).

In that case, the plaintiff objected to the defendant employer's mandatory COVID-19 vaccination requirement. *See id.* at 1. The court granted summary judgment, in part, for the defendant because the plaintiff "failed to 'provide concrete evidence,' . . . to support her claim. She offer[ed] only a 'conclusory assertion' that her professed religious belief was anything more than one adopted for the purpose of avoiding what [the plaintiff] independently (and not on the basis of religion) believed to be an inconvenient or dangerous obligation . . . ." *Id.* at *15. The plaintiff "claimed to have been a member of the Temple of Healing Spirit for twenty years, [but] she offer[ed] nothing other than her statement to support that assertion. She was not able to recall any other member of the Temple of Healing Spirit." *Id.* "She could not say when she attended Temple of the Healing Spirit events. Although she claimed to have attended events remotely, she was unable to offer an internet link through which she accessed Temple of the Healing Spirit events." *Id.* "She could not identify how many meetings she attended in person, where she attended them (other than a home in Brooklyn), or anyone who attended with her, including how many people attended." *Id.* (citations omitted). "The vaccine exemption letter does not provide evidence that [the plaintiff]'s purported religious views were genuinely held; the evidence is overwhelming that [the plaintiff] solicited the vaccine exemption letter on the eve of the Vaccination Policy and for the purpose of obtaining an exemption." *Id.*

Here, this there is enough evidence to raise a dispute of fact. Plaintiff did request off work for Shabbat and testified to meeting with "fellow people of the same faith" "[s]everal times a week." Dkt. No. 38-4 at 131, 141. Plaintiff did declare that her "beliefs are rooted in the Old

Testament, the Tanakh, the Book of Jasher, and the Book of Jubilees."  Dkt. No. 39-4 at ¶ 5.  She

attests that her "immediate family members who follow [her] faith do not receive vaccinations."

*Id.* at ¶ 4.  During her deposition, Plaintiff testified that her objection to the influenza vaccine was

because "[t]he Most High heals us.  We can -- the pawer [sic] we pray to, um, heals, and, um, has

provided for plants and animals, as it is explained in the scriptures.  Healing comes from, um --

from following the guidelines that were given in the old testament."  Dkt. No. 38-4 at 138.

However, Plaintiff stated that there had never been an instance where she declined other medical

treatment based on her religious beliefs.  *See id.*  She also said that her beliefs about healing

related to her religion as an Israelite and her beliefs as an American Indian.  *See id.* at 139.  She

did not know if anyone else in her fellowship objected to vaccines, she did not testify to any

specific scripture passages that require an objection to vaccines, and she did not list religion as a

reason for her vaccination declination on the 2017 or 2018 forms.  *See* Dkt. No. 39-1 at ¶¶ 35, 38-

39.

Further, Plaintiff was notified of the policy change on August 22, 2019.  *See* Dkt. No. 39-1

at ¶ 51.  The notification informed employees that compliance was required by November 12,

2019.  *See id.*  Defendant sent five follow up reminder e-mails in September and October 2019.

*See id.* at ¶ 52.  Ms. Estey sent Plaintiff a personal e-mail on November 5, 2019.  *See id.* at ¶ 53.

Defendant sent another e-mail to all employees on November 6, 2019.  *See id.* at ¶ 54.  Ms. Estey

e-mailed Plaintiff a personal reminder on November 7, 2019.  *See id.* at ¶ 55.  It was not until

November 8, 2019—the eve of the compliance deadline—that Plaintiff told Ms. Estey she would

not receive the vaccine.  *See id.* at ¶ 56.  In her November 8, 2019, letter, Plaintiff did not mention

Israelite or religion.  At the bottom of her letter, she did include "references," one of which is to

the New York State Constitution's religious freedom clause as well as the equal protection clause.

Dkt. No. 39-14 at 2. Plaintiff's letter stated as follows:

> I am not in agreement with this change and request to be able to continue working under the terms of the original contract. Recently, I've worn a face mask while in patient care areas and will continue to responsibly wear a face mask and practice good hand hygiene whenever I am in patient care areas in recognition of the organization's patient care goals.
>
> I trust the management will find these terms agreeable and will allow me to continue employment as I enjoy the work I perform and do not wish to end my employment at this time. I do not agree to allow a stranger to assault my person. If the above terms are acceptable, please provide me authorization for my uninterrupted employment.

Dkt. No. 39-14 at 2.

Plaintiff declares that she followed her letter with a phone call to "AMC human resources staff where [she] asked for a religious accommodation but was rebuffed." Dkt. No. 39-4 at 3. Plaintiff testified that she told Ms. Estey and Ms. Pierre that she would not get vaccinated because it went "against [her] religious beliefs, [her] sincerely held religious beliefs." Dkt. No. 38-4 at 104, 108. Plaintiff did not remember exactly what she said but remembered telling Ms. Estey that Plaintiff "prayed on it" and "it was a spiritual religious issue." *Id.* Ms. Pierre testified that she was not informed that the reason Plaintiff was objecting was because of religion. *See* Dkt. No. 38-7 at 18-19. Ms. Pierre "remember[ed]" that Plaintiff "did request [a religious accommodation] at the very end." *Id.* at 19. Ms. Estey testified in her deposition that Plaintiff informed her that she was not going to be vaccinated "because of her beliefs." Dkt. No. 38-5 at 17. Ms. Estey stated that Plaintiff did not explain what those "beliefs" were. *Id.*

Plaintiff did not provide the precise scriptures related to her objections or know whether others in her fellowship objected to vaccines, she waited until nearly the last moment to write a

letter concerning her objections, and her letter does not mention her religion but states that she did not agree with letting a "stranger [] assault [her] person." Dkt. No. 39-14 at 2. Nevertheless, the credibility of her beliefs is not for the Court to weigh at this juncture. Plaintiff testified that she told Ms. Estey and Ms. Pierre that her objections were religious, and she cited the religious freedom clause in her letter. Thus, Plaintiff has presented enough evidence to raise a genuine dispute of material fact as to whether her beliefs are sincere.[1]

### 2. *Whether Plaintiff Informed Defendant of Her Religious Beliefs*

Defendant next argues that Plaintiff failed to inform Defendant of her religious beliefs. *See* Dkt. No. 38-1 at 7-8. Plaintiff relies on her deposition testimony to support the argument that she did inform Defendant about her beliefs. *See* Dkt. No. 29 at 6-7. Specifically, she testified that in 2018, during an employment physical, she told the "physician in employee health" that she did not want the influenza vaccine "due to religious reasons." Dkt. No. 38-4 at 55-57. Plaintiff told "[a] person in employee health" when she "turned in the declination form." *Id.* at 57. Plaintiff testified that she "requested religious accommodation for her Israelite practice of Shabbat observance and Albany granted it." Dkt. No. 39 at 6. Plaintiff explained that when she called Ms. Estey, she "discussed with her the fact that the flu vaccine goes against [Plaintiff's] religious beliefs, [her] sincerely held religious beliefs, and [she] would not be able to do this." *Id.* at 104. Plaintiff told Ms. Estey that she "prayed on it." *Id.* She also testified to speaking with Ms. Pierre and told Ms. Pierre "that [she] had religious – for religious reasons, [she] would like to request an exception for accommodation. And [she] wanted to speak with someone who had the authority to

---

[1] Defendant does not argue that Plaintiff's belief is not religious. *See generally* Dkt. No. 38-2. Courts have noted that "'anti-vaccination beliefs' themselves 'are not religious' and, therefore, are not entitled to accommodation under Title VII." *Aukamp-Corcoran v. Lancaster Gen. Hosp.*, No. 19-CV-5734, 2022 WL 507479, *4 (E.D. Pa. Feb. 18, 2022) (quoting *Fallon v. Mercy Catholic Med. Ctr. of Southeastern Pa.*, 877 F.3d 487, 492 (3d Cir. 2017)).

listen." *Id.* at 108.  Ms. Estey testified that Plaintiff told her that Plaintiff was not getting

vaccinated "because of her beliefs."  Dkt. No. 38-5 at 17.  In response to a question about whether

Plaintiff ever "asked for a religious accommodation to not get vaccination," Ms. Pierre testified

that "either after [Plaintiff] was let go or right before [Plaintiff] was let go she had requested . . . .

She did request it at the very end."  Dkt. No. 38-7 at 19.

Insofar as Plaintiff relies on her request for time off to observe Shabbat, knowledge that

Plaintiff is religious and observes certain practices unrelated to vaccinations does not establish

that Defendant knew she objected to the influenza vaccination because of her religion.  *See Knight*

*v. Connecticut Dep't of Pub. Health*, 275 F.3d 156, 167-68 (2d Cir. 2001) ("[The] plaintiffs failed

to make out their *prima facie* cases.  Neither appellant can show the state was on notice of their

need to evangelize to clients.  Clearly, both [the] plaintiffs hold bona fide religious beliefs, and

their employers knew both were born-again Christians, but there is no evidence in the record

showing appellants requested any sort of accommodation for their need to evangelize.

Knowledge that [the plaintiffs] are born-again Christians is insufficient to put their employers on

notice of their need to evangelize to clients").

Defendant argues that Plaintiff cannot rely on her contention that she made a "2018

statement to an unidentified Albany Med provider in the context of a personal medical

appointment, as Plaintiff does not allege that this provider communicated such information to

Plaintiff's supervisor(s) or the Human Resources Department."  Dkt. No. 40 at 2.  Under Title VII,

"[t]he term 'employer' means a person engaged in an industry affecting commerce who has fifteen

or more employees . . . and any agent of such a person[.]"  42 U.S.C. § 2000e(b).  Neither

Plaintiff nor Defendant explain whether the "employee health" individual who conducted

Plaintiff's physical examination in October 2018 constitutes an "employer."  Dkt. No. 38-4 at 71-

72.  Plaintiff was asked during her deposition whether she "ever specifically discuss[ed] a religious accommodation with anybody at Albany Med in 2018," and she responded, "No."  Dkt. No. 38-4 at 76.

However, she has presented enough evidence to raise a dispute as to whether she informed Defendant of her religious beliefs given her, Ms. Pierre's, and Mr. Estey's deposition testimonies. Although there is no documentary evidence that has been provided which shows that Plaintiff informed Defendant, in writing, of her beliefs and how they correlate to her vaccination objection, no such requirement exists to raise a dispute of material fact.  *See Scillia v. Am. Educ. Servs.*, No. 3:22-CV-1257, 2024 WL 1769306, *4 (D. Conn. Apr. 24, 2024) ("[R]equests for reasonable accommodations do not have to be formal"); *see also Equal Opportunity Emp. Comm'n v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 389 (E.D.N.Y. 2016) ("The court notes that deposition testimony can be sufficient to create genuine disputes of material fact for purposes of summary judgment") (citing *Hamilton v. A C & S, Inc.*, No. 94-CV-4397, 1998 WL 633682, *4 (S.D.N.Y. Sept. 15, 1998) ("A litigant's deposition testimony is sufficient to raise an issue of fact precluding summary judgment")) (footnote omitted).

Thus, the deposition testimony stating that Plaintiff informed Ms. Estey and Ms. Pierre of her objection to the vaccination because of her "beliefs" and her own testimony that she informed them of her "religious reasons" is sufficient to create a dispute of material fact as to whether she informed Defendant of her religious beliefs.  *See Hussein v. Hotel Emps. & Rest. Union, Loc. 6*, 108 F. Supp. 2d 360, 369 (S.D.N.Y. 2000), *vacated sub nom. on other grounds Hussein v. Hotel Emps.*, 14 Fed. Appx. 39 (2d Cir. 2001) ("At deposition, [the plaintiff] conceded that he never provided the Union with a note from any Muslim cleric confirming his claimed need to be excused from roll call every Friday afternoon as his day of rest. . . .  However, in his affidavit,

[the plaintiff] stated that in August of 1997, he informed the Union President . . . that he could not be present for roll call on Friday afternoons due to his religious obligations. . . . Thus, there is a material issue of fact as to whether [the plaintiff] properly notified the Union of his religious beliefs").[2]

### 3. Undue Hardship

Defendant argues that allowing Plaintiff's requested religious accommodation would impose an undue hardship on Albany Medical Center. *See* Dkt. No. 38-2 at 8. Defendant contends that "allow[ing] Plaintiff her requested accommodation—to wear a mask instead of receiving the vaccination—would have created an unacceptable risk to Albany Med's patients, personnel, and visitors." *Id.* at 10. Defendant also states that "a hospital is not necessarily required to engage in a personalized interactive process with each individual employee where the applicable vaccine policy was adopted after careful consideration of the type of accommodation requested and a determination was made that such an accommodation was not feasible." *Id.* at 11.

Plaintiff argues that Defendant did not engage in an interactive process with Plaintiff, has failed to offer any analysis of the purported undue burden, and has failed to show that no other accommodation was possible. *See* Dkt. No. 39 at 8-12. Plaintiff asserts that "Albany offers no evidence that unvaccinated workers wearing masks presents an 'excessive or unjustifiable' burden to its business operations." *Id.* at 11.

"An employer does not violate Title VII . . . if it can show that the prospective accommodation 'would cause the employer to suffer an undue hardship.'" *Adamowicz v. Northwell Health Inc.*, No. 2:23-CV-01277, 2024 WL 1072210, *6 (E.D.N.Y. Mar. 12, 2024)

---

[2] As to the third prong of the *prima facie* case, Defendant does not dispute that Plaintiff was disciplined. *See generally* Dkt. No. 38-2.

(quoting *Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002)).   "'[U]ndue hardship' is shown when a burden is substantial in the overall context of an employer's business."   *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (citation omitted).   "Undue hardship can [] exist if the proposed accommodation would 'either cause or increase safety risks or the risk of legal liability for the employer.'"   *Robinson v. Children's Hosp. Bos.*, No. 14-CV-10263, 2016 WL 1337255, *8 (D. Mass. Apr. 5, 2016) (quoting *E.E.O.C. v. Oak-Rite Mfg. Corp.*, No. 99-CV-1962, 2001 WL 1168156, *10 (S.D. Ind. Aug. 27, 2001)); *see also Abdelsayed v. New York Univ.*, No. 17-CV-9606, 2023 WL 4705999, *10 (S.D.N.Y. July 24, 2023) (agreeing with the defendant "that [the p]laintiff's first proposed accommodation ('A seating arrangement should be available for prolonged procedures, such as those lasting longer than 20 to 30 minutes') is unreasonable because it would negatively impact patient care and jeopardize patient safety").

There is an abundance of case law from across the country concerning religious exemptions and vaccinations, and whether rejecting the former to require the latter causes an undue burden.  That case law is, however, in the context of COVID-19 vaccinations.  The cases discuss two ways in which employers faced undue burdens: (1) by placing the employer at risk of violating state law; and (2) by placing a vulnerable population of people at higher risk of infection.

As to the first, during the COVID-19 pandemic, "New York state law provided that 'all [][c]overed entities shall continuously require personnel to be fully vaccinated against COVID-19.'"  *McDaniel v. Univ. of Rochester*, No. 23-CV-6164, 2024 WL 1931917, *2 (W.D.N.Y. May 2, 2024) (quoting 10 N.Y.C.R.R. § 2.61)).  "A 'hospital' is a covered entity and 'personnel' includes 'all persons employed or affiliated with a covered entity . . . who engage in activities such that if they were infected with COVID-19, they could potentially expose other covered

personnel, patients or residents to the disease.'" *Id.* (quoting 10 N.Y.C.R.R. § 2.61).  "While

Section 2.61 provides medical exemptions, it does not provide religious exemptions." *Id.* (citation

omitted).

In reviewing New York's COVID-19 law and the interplay between mandatory

vaccination requirements and religious exemptions, the Second Circuit noted that "it appears that

for decades, those charged with protecting the public health against infectious disease in New

York State have required vaccination of *all* medically eligible employees and treated the

requirement as a condition of employment in the healthcare arena." *We The Patriots USA, Inc. v.*

*Hochul*, 17 F.4th 266, 287 (2d Cir.), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021).  "For

example, the State has required healthcare employees to be vaccinated against rubella and measles

since 1980 and 1991, respectively, without a religious exemption." *Id.*; *see also Does 1-2 v.*

*Hochul*, 632 F. Supp. 3d 120, 138, n.23 (E.D.N.Y. 2022) (citing 10 N.Y.C.R.R. § 405.3 (requiring

hospital personnel to be vaccinated against rubella, allowing for medical exemptions but not

religious exemptions); *id.* § 415.26 (requiring nursing home personnel to be vaccinates against

measles and rubella, allowing for medical exemptions but not religious exemptions); *id.* § 751.6

(requiring employees of diagnostic and treatment centers to be vaccinated against measles and

rubella, allowing for medical exemptions but not religious exemptions); *id.* § 763.13 (requiring

personnel of certified home health agencies, long term home healthcare programs and AIDS home

care programs to be vaccinated against measles and rubella, allowing for medical exemptions but

not religious exemptions); *id.* § 766.11 (requiring personnel of licensed home care services

agencies to be vaccinated against measles and rubella, allowing for medical exemptions but not

religious exemptions); *id.* § 794.3 (requiring hospice personnel to be vaccinated against measles

and rubella, allowing for medical exemptions but not religious exemptions); *id.* § 1001.11

(requiring assisted living personnel to be vaccinated against measles and rubella, allowing for medical exemptions but not religious exemptions)).

Here, however, there was no state law requiring influenza vaccination that Defendant would have been at risk of violating had it granted Plaintiff's religious accommodation request. Plaintiff provides a December 5, 2019, New York State press release which states that "New York State Health Commissioner Dr. Howard Zucker today declared that influenza is now prevalent in New York State. This announcement puts into effect a regulation requiring that healthcare workers who are not vaccinated against influenza wear surgical or procedure masks in areas where patients are typically present." Dkt. No. 39-16 at 2. The press release explains that a "Regulation . . . first went into effect during the 2013-14 influence season. It requires unvaccinated health care workers in certain healthcare facilities regulated by the New York State Department of Health to wear surgical or procedure masks during those times when the Commissioner declares that influenza is prevalent in New York State." *Id.* Therefore, Defendant was not at risk of being punished by the State if it did not require influenza vaccinations by its employees.

Rather, Defendant argues that Plaintiff's request would have caused an undue burden because of the exposure risk to patients and staff. *See* Dkt. No. 38-2 at 10-11. Defendant contends that "Plaintiff admits to all of the facts outlined by Albany Med in support of its determination that granting religious exemptions to the mandatory influenza Vaccination Policy—including allowing employees to wear a mask as Plaintiff claims to have requested— would pose an unacceptable risk to patients and create an undue hardship for Albany Med." Dkt. No. 40 at 2. However, Plaintiff did deny a number of the statements set forth in Defendant's statement of material facts. As it relates to the undue burden issue, Defendant attested that

"Albany Med provides reasonable accommodations for employees with sincerely held religious beliefs, absent an undue hardship on the organization or negative impact on quality patient care." Dkt. No. 39-1 at ¶ 15.  Plaintiff responded, "Deny.  Plaintiff's experience with [Albany Medical Center] shows that Defendant decided to not allow religious accommodations without any dialogue or interactive process in 2019." *Id.*  Plaintiff admitted that the ICC "determined that requiring unvaccinated employees to wear a surgical mask for a long period of time was not an effective infection control practice." *Id.* at ¶ 43.

"Vaccination requirements are a common feature of the provision of healthcare in America: Healthcare workers around the country are ordinarily required to be vaccinated for diseases such as hepatitis B, *influenza*, and measles, mumps, and rubella." *Biden v. Missouri*, 595 U.S. 87, 95 (2022) (citing CDC, *State Healthcare Worker and Patient Vaccination Laws* (Feb. 28, 2018), https://www.cdc.gov/phlp/publications/topic/vaccinationlaws.html)) (emphasis added). This Court has found only two cases addressing a religious exemption to an influenza vaccination requirement in the healthcare field.  Those cases concluded that allowing the exemption would cause an undue hardship on the healthcare employer.  *See Robinson v. Children's Hosp. Bos.*, No. CV 14-10263, 2016 WL 1337255, *9 (D. Mass. Apr. 5, 2016) ("The Hospital contends that granting [the plaintiff's] request would have been an undue hardship because it would have increased the risk of transmitting influenza to its already vulnerable patient population. . . .  On this record, the Court agrees"); *Aukamp-Corcoran v. Lancaster Gen. Hosp.*, No. 19-CV-5734, 2022 WL 507479, *6-8 (E.D. Pa. Feb. 18, 2022) (relying on declarations from the defendant hospital to conclude that "non-medical exemptions to mandatory vaccination programs for healthcare workers increases the risk that vaccine-preventable disease will spread" and that "use of surgical masks is less effective at preventing the spread of influenza in healthcare facilities than

24

vaccination").

Defendant attested in their statement of material facts, and Plaintiff admitted, that "[t]he Center for Disease Control and Prevention (CDC) estimated that in the 2018- 2019 flu season, approximately 29 million people contracted influenza, with 13 million of those visiting a health care provider for the illness.  Of those, 380,000 were admitted to the hospital, and 28,000 people died from the virus."  Dkt. No. 39-1 at ¶ 28 (citing Estimated Influenza Illnesses, Medical visits, Hospitalizations, and Deaths in the United States—2018–2019 Influenza Season, CDC, https://archive.cdc.gov/#/details?url=https://www.cdc.gov/flu/about/burden/2018-2019.htm).[3]

Defendant explained that its ICC reviews employee compliance with vaccination policies and discusses potential changes and improvements to the policies and compliance.  *See* Dkt. No. 39-1 at ¶ 40.  In 2019, Defendant's managers and supervisors reported difficulty in monitoring whether unvaccinated employees wore masks.  *See id.* at ¶ 41.  Patients were confused why some employees wore masks and others did not.  *See id.* at ¶ 42.  The ICC "determined that requiring unvaccinated employees to wear a surgical mask for a long period of time was not an effective infection control practice."  *Id.* at ¶ 43.  "The ICC also considered that vaccination is the most effective way to prevent the spread of influenza."  *Id.* at ¶ 44.  In the press release provided by Plaintiff, the New York State Department of Health stated that "the vaccine remains the most effective way to protect public health."  Dkt. No. 39-16 at 2.  Thus, in 2019, the ICC unanimously voted to adopt a mandatory influenza vaccination policy.  *See* Dkt. No. 39-1 at ¶ 46.  Defendant revised its policy accordingly.  *See id.* at ¶ 47.  "Like Albany Med's vaccination policy for

---

[3] These numbers are admittedly less drastic as compared to those related to COVID-19.  *See Ferrelli v. Unified Ct. Sys.*, No. 1:22-CV-0068, 2022 WL 673863, *1 (N.D.N.Y. Mar. 7, 2022) (footnotes omitted) ("SARS-COV-2 . . . is a deadly virus that has killed over 950,000 Americans and over 54,000 New Yorkers since March of 2020").

measles, mumps, rubella, and Hepatitis B, the mandatory influenza vaccination policy did not allow religious exemptions." *Id.* at ¶ 49.

Plaintiff does not present any evidence to rebut Defendant's contentions concerning the ICC process, the impact of influenza at Albany Medical Center to staff and patients, or the effectiveness of vaccinations in preventing the spread of the disease. *See generally* Dkt. No. 39. This leads the Court to conclude that Plaintiff has not raised a dispute as to whether her requested accommodation would cause an undue hardship to Defendant.

To be sure, as the Second Circuit clarified in *We The Patriots*, the New York state law related to COVID-19 did "not bar an employer from providing an employee with a reasonable accommodation that removes the individual from the scope of the [COVID-19] Rule." We The Patriots, 17 F.4th at 370 (quotation omitted). "In other words, it may be possible under the Rule for an employer to accommodate—not exempt—employees with religious objections, by employing them in a manner that removes them from the Rule's definition of 'personnel.'" *Id.* "Such an accommodation would have the effect under the Rule of permitting such employees to remain unvaccinated while employed." *Id.*

Such an accommodation was denied in *We The Patriots* because "[t]o avoid Title VII liability for religious discrimination, an employer 'need not offer the accommodation the employee prefers.' . . . Instead, an employer must offer a *reasonable* accommodation that does not cause the employer an undue hardship." *We The Patriots*, 17 F.4th at 292 (quoting *Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002)). "Title VII does not require covered entities to provide the accommodation that [the p]laintiffs prefer—in this case, a blanket religious exemption allowing them to continue working at their current positions unvaccinated." *Id.* The Second Circuit clarified that "although [the COVID-19 Rule] bars an employer from granting a religious

*exemption* from the vaccination requirement, it does not prevent employees from seeking a

religious *accommodation* allowing them to continue working consistent with the Rule, while

avoiding the vaccination requirement." *Id.*

      Here, as Plaintiff contends, there was no discussion between Plaintiff and Defendant about

whether she could be removed from her position and remain unvaccinated. However, there is no

evidence in the record that she requested such an accommodation. Rather, the evidence reveals

that she asked for the same thing that the plaintiffs in *We The Patriots* requested: to remain

unvaccinated and stay in her position which required her to interact with staff and patients. *See*

Dkt. No. 39-14 at 2. Plaintiff disputes the frequency with which she interacted with staff and

patients, but she does not contest that she had "close" contact with those individuals. *See* Dkt.

No. 39-1 at ¶ 7. Denying such a blanket exemption has been upheld by numerous courts. *See*

*Marte v. Montefiore Med. Ctr.*, No. 22-CV-03491, 2022 WL 7059182, *4 (S.D.N.Y. Oct. 12,

2022) ("This is exactly the type of accommodation [the p]laintiff requested—permission to

remain in her position without being vaccinated. . . . The only accommodation [the p]laintiff

requested was found to be unreasonable and an undue hardship in *We The Patriots*"); *Mace v.*

*Crouse Health Hosp., Inc.*, No. 5:22-CV-1153, 2023 WL 5049465, *7 (N.D.N.Y. Aug. 8, 2023)

("[N]umerous courts in this Circuit have also concluded that a plaintiff who seeks a religious

accommodation that entitles them to work in direct patient care without vaccination seeks an

accommodation that represents an undue burden to the employer") (collecting cases); *Conde v.*

*Mid Hudson Reg'l Hosp. Med. Ctr.*, No. 22-CV-3085, 2024 WL 168282, *8 (S.D.N.Y. Jan. 12,

2024) ("[I]n light of [the] plaintiff's role as a patient-facing nurse, the Court cannot conceive of an

accommodation that would neither have violated Section 2.61 nor resulted in an undue burden to

defendants. At the very least, [the] plaintiff would have been 'unable to perform patient care

duties requiring physical contact with patients,' and, therefore, another nurse would have had to cover those duties or defendants would have needed to hire a replacement nurse"); *Kane v. de Blasio*, 623 F. Supp. 3d 339, 362-63 (S.D.N.Y. 2022) ("In all other circumstances in which it denied a plaintiff's request for a religious accommodation, the Citywide Panel found that the plaintiff's request presented an 'undue hardship' because the plaintiff 'is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population.' . . . These findings satisfied the requirements of Title VII").

Based on the foregoing, the Court concludes that Plaintiff's requested accommodation was not reasonable as it was a blanket exemption request which would have allowed her to continue interacting with staff and vulnerable patients while unvaccinated. This exemption would have caused an undue hardship on Defendant. *See Robinson*, 2016 WL 1337255, at *9; *Aukamp-Corcoran*, 2022 WL 507479, at *6-8. Thus, Defendant's motion is granted as to Plaintiff's reasonable accommodation claim.

## C.    Disparate Treatment

"Section 703(a)(1) of Title VII makes it unlawful for an employer 'to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 269 (2d Cir. 2023) (quoting 42 U.S.C. § 2000e-2(a)(1)). "In adopting this language, 'Congress intended to prohibit all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race, religion, sex, or national origin.'" *Id.* (quotation omitted). "To prevail on a disparate treatment claim under Title VII, plaintiffs must establish that they have suffered an 'adverse job action under circumstances giving

28

rise to an inference of discrimination.'" *Id.* (quoting *Tassy v. Buttigieg*, 51 F.4th 521, 529 (2d Cir. 2022)) (additional citation omitted).

"With respect to a Title VII individual disparate treatment claim, '[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors.'" *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 151 (2d Cir. 2012). "'Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)). "A plaintiff establishes a prima facie case by showing '(1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.'" *Id.* (quoting *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)). An employer may then rebut this prima facie case by offering a legitimate, nondiscriminatory business reason for its conduct. . . . A plaintiff ultimately prevails if he proves that the defendant's employment decision was based in whole or in part on intentional discrimination." *Id.* (citations omitted).

Defendant argues that Plaintiff was unqualified for her position based on her refusal to receive the influenza vaccine and that she cannot establish a causal connection between her religion and termination. *See* Dkt. No. 38-2 at 14-16. Plaintiff disputes both arguments. *See* Dkt. No. 39 at 12-14.

### *1. Whether Plaintiff was Qualified for Her Position*

"The Second Circuit has held that in order to establish that she was qualified for the position, a plaintiff must establish 'basic eligibility for the position at issue.'" *Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 267 (E.D.N.Y. 2013) (quoting *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 81 (2d Cir. 2009)) (additional quotation omitted). "Eligibility requirements are defined by the employer, and a plaintiff's subjective belief that she is qualified for the position is not sufficient." *Id.* (citations omitted). "The burden on a plaintiff to show qualifications at the prima facie stage is quite low, and she need only show that she 'possesses the basic skills necessary for performance of the job.'" *Wheeler v. Bank of New York Mellon*, 256 F. Supp. 3d 205, 216 (N.D.N.Y. 2017) (quoting *Thelwell v. City of New York*, No. 13-CV-1260, 2015 WL 4545881, *13 (S.D.N.Y. July 28, 2015)) (additional quotation omitted). "'[E]specially where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw.'" *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001)).

Defendant argues that Plaintiff was unqualified for her position because she was unvaccinated, which was a condition of her employment. *See* Dkt. No. 38-2 at 14. To support this contention, Defendant quotes the Second Circuit's decision in *We The Patriots* which stated that "[v]accination is a condition of employment in the healthcare field." *Id.* (quoting *We The Patriots*, 17 F.4th at 295). Plaintiff argues that she was qualified for her position because "Albany in this case has not proffered any evidence that [Plaintiff] was not performing her job at a minimal satisfactory level at the time of her wrongful termination." Dkt. No. 39 at 13. She contends that Defendant cannot use her unvaccinated status as a reason to deem her unqualified because "were employers allowed to use the basis of the requested accommodation as evidence of

disqualification, no employee requesting accommodation would be deemed qualified." *Id.*
Plaintiff provides no case law to support this argument.

Despite Plaintiff's objections, Defendant appropriately recites the current state of the law.
Following the Second Circuit's decision in *We The Patriots*, "case law from this Circuit and in the
State of New York supports a finding that vaccination is a lawful condition of employment."
*Broecker v. New York City Dep't of Educ.*, 585 F. Supp. 3d 299, 316 (E.D.N.Y. 2022), *aff'd*, No.
23-655, 2023 WL 7485465 (2d Cir. Nov. 13, 2023), and *aff'd*, No. 23-655, 2023 WL 8888588 (2d
Cir. Dec. 26, 2023); *see also Bandalos v. Stony Brook Univ. Med. Ctr.*, No. 23-CV-0135, 2024
WL 1308708, *4 (E.D.N.Y. Mar. 27, 2024) ("But the plaintiff has not plausibly alleged that she
was qualified for her position at the time of her suspension. . . .  [T]he vaccine mandate 'changed
[the plaintiff's] job requirements to include that she must be vaccinated with one of the COVID-
19 vaccines unless she received an authorized exemption.' . . . . The plaintiff did not get the
vaccine and her request for an exemption was denied; accordingly, she has not alleged that she
was qualified for her position at the time of her suspension"); *Marciano v. de Blasio*, 589 F. Supp.
3d 423, 432-33 (S.D.N.Y. 2022), *appeal dismissed sub nom. Marciano v. Adams*, No. 22-570-CV,
2023 WL 3477119 (2d Cir. May 16, 2023), *cert. denied*, 144 S. Ct. 286 (2023) ("[The plaintiff]
has failed to satisfy a condition of his employment, that is, that he be vaccinated against COVID-
19"); *Garland v. New York City Fire Dep't*, 574 F. Supp. 3d 120, 129 (E.D.N.Y. 2021) ("[The
p]laintiffs failed to satisfy this condition of employment, rendering themselves no longer qualified
to serve as FDNY employees"); *D'Cunha v. Northwell Health Sys.*, No. 1:22-CV-0988, 2023 WL
2266520, *3 (S.D.N.Y. Feb. 28, 2023), *aff'd*, No. 23-476-CV, 2023 WL 7986441 (2d Cir. Nov.
17, 2023) ("Northwell determined that vaccination was a condition of employment for its patient
facing healthcare workers, including [the plaintiff]. . . .  Accordingly, the Complaint fails to allege

she was 'qualified for her position'"); *Beickert v. N.Y.C. Dep't of Educ.*, No. 22-CV-5265, 2023 WL 6214236, *4 (E.D.N.Y. Sept. 25, 2023) ("Even if [the plaintiff] plausibly had alleged a bona fide religious belief, the Court also finds, as [the Department of Education] contends, that [the Department] could not accommodate [the plaintiff] without suffering an undue hardship.  Courts in this Circuit have found that vaccination against COVID-19, including the [Department's] Vaccine Mandate, is a proper condition of employment").

Here, Defendant revised their policy to require mandatory influenza vaccination, which became effective in May 2019.  *See* Dkt. No. 39-1 at ¶¶ 47-48.  Although, as Plaintiff contends, this policy was not in place prior to 2019, *see id.* at ¶¶ 18, 20, it became a condition of employment when Defendant implemented the policy.  "Employers have broad discretion to determine the necessary job qualifications." *Sulehria v. City of New York*, 670 F. Supp. 2d 288, 309 (S.D.N.Y. 2009) (citations omitted).  As the Second Circuit has concluded that vaccination is a proper "condition of employment in the healthcare field," *We The Patriots*, 17 F.4th at 294, the Court concludes that Plaintiff was unqualified for her position at the time of her termination in November 2019 because she did not receive the mandatory influenza vaccination.  Plaintiff's belief that she was qualified for her position does not alter the Court's conclusion because her "'own standards, or subjective view of [her] performance, is not relevant to the analysis[.]'" *D'Cunha*, 2023 WL 2266520, at *3 (quoting *Martin v. City Univ. of New York*, No. 17-CV-6791, 2018 WL 6510805, *8 (S.D.N.Y. Dec. 11, 2018)) (additional citation omitted).

Accordingly, the Court grants Defendant's motion as to Plaintiff's disparate treatment claim.  Even if Plaintiff was qualified for her position, she has not raised a dispute of fact concerning a causal connection between her religion and termination.

 2.  *Whether There is a Casual Connection Between Plaintiff's Religion and*
      *Termination*

Defendant argues that "there is no evidence to support Plaintiff's allegations that she was discriminated against or terminated due to her religion.  Nor can Plaintiff provide evidence that her termination was due to religious animus toward Israelites specifically."  Dkt. No. 38-2 at 15. Plaintiff states that "[t]he lack of a good faith effort by Albany to engage in the interactive process with [Plaintiff] can be evidence of discrimination towards [Plaintiff]."  Dkt. No. 39 at 14. Plaintiff provides zero support for this contention.  Plaintiff also argues that the temporal proximity between her request for an accommodation and termination raises an inference of discrimination.  *See id.*

"'[C]ausation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'"  *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 581 (S.D.N.Y. 2010) (quoting *Gordon v. N.Y.C. Bd. Of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)) (alteration in original) (additional citation omitted).  "[W]hen 'timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'"  *Id.* (quoting *Slattery*, 248 F.3d at 95).

"'The Second Circuit has not established a bright line rule as to how closely an adverse employment action must follow protected activity to imply that the former was in retaliation for the latter.'"  *Redd v. New York State Div. of Parole*, 923 F. Supp. 2d 371, 388 (E.D.N.Y. 2012) (quoting *McDowell v. N. Shore-Long Island Jewish Health Sys., Inc.*, 788 F. Supp. 2d 78, 82

(E.D.N.Y. 2011)) (additional citation omitted).  "The Supreme Court has stressed, however, that '[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.'"  *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

"Moreover, '[a]n employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act.'"  *Washington v. NYC Madison Ave. Med. P.C.*, No. 20-CV-03446, 2023 WL 4980215, *4 (S.D.N.Y. Aug. 3, 2023) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013)).  "'So-called but-for causation is not the test.  It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.'"  *Id.* (quotation omitted).

"[W]here a plaintiff seeks to make out her prima facie case by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that she shared sufficient employment characteristics with that comparator so that they could be considered similarly situated."  *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001).  "A plaintiff is not obligated to show disparate treatment of an identically situated employee.  To the contrary, . . . , it is sufficient that the employee to whom plaintiff points be similarly situated in all material respects."  *Id.*  "In other words, where a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."  *Id.*; *see also Galimore v. City Univ. of New York Bronx Cmty. Coll.*, 641 F. Supp. 2d 269, 283 (S.D.N.Y. 2009) (citations

omitted) ("[A] plaintiff must offer sufficient evidence from which a jury could reasonably conclude that there was indeed disparate treatment of similarly situated employees").

Plaintiff asserts that "Albany created a situation that benefited members outside of her protected class." Dkt. No. 39 at 14.  However, Plaintiff does not present a comparator who was treated differently by Defendant. *See id.*  Ms. Castilla stated in her declaration that "Plaintiff was not the only employee who was terminated for failing to obtain the influenza vaccination by the November 12th deadline.  Albany Med terminated any employee who failed to provide proof of immunization by the deadline, irrespective of the reason or basis offered for the refusal." Dkt. No. 38-11 at ¶ 17.

Plaintiff argues that she has shown that religion was a motivating factor in Defendant's decision because the hospital allowed for employees with medical contraindications to remain unvaccinated. *See* Dkt. No. 39 at 19.  This argument has been rejected in the context of the COVID-19 vaccine.  The Second Circuit,  in *We The Patriots*, concluded "that 'applying the [mandatory COVID-19 vaccination requirement] to those who oppose vaccination on religious grounds furthers the State's asserted interests, whereas applying the [requirement] to those subject to medical contraindications or precautions based on pre-existing conditions would undermine the government's asserted interest in protecting the health of covered personnel.'" *Algarin v. NYC Health + Hosps. Corp.*, 678 F. Supp. 3d 497, 516-17 (S.D.N.Y. 2023), *aff'd sub nom. Algarin v. New York City Health & Hosps. Corp.*, No. 23-1063, 2024 WL 1107481 (2d Cir. Mar. 14, 2024) (quoting *We The Patriots*, 17 F.4th at 284-88).  "In other words, applying the vaccination requirement to those with medical contraindications would not advance the governmental interest in protecting the health of the workforce and allow them to continue working." *Id.* "Indeed, the Supreme Court has long acknowledged that a state may not be permitted to require vaccinations

of those with contraindications or if it would 'seriously impair [their] health.'" *Id.* (quoting

*Jacobson v. Massachusetts*, 197 U.S. 11, 39 (1905) (upholding constitutionality of vaccine

mandate during smallpox outbreak), and citing *Philips v. City of New York*, 775 F.3d 538, 543 (2d

Cir. 2015) (holding that mandatory vaccination for chicken pox during the chicken pox outbreak

as a condition for admission to school does not violate Free Exercise Clause)).

Additionally, "the risks associated from the exemptions are not comparable because a

medical exemption may be limited in duration, . . . whereas a religious exemption could be

permanent." *Algarin*, 678 F. Supp. 3d at 517 (quoting *We The Patriots*, 17 F.4th at 286).  The

COVID-19 vaccination requirement also did "not single out religious employees – it 'applie[d]

equally to all employees who c[ould] be vaccinated safely, regardless of their religious beliefs or

practices, whether they have political objections to the vaccine, or question [its] efficacy or safety,

or any of the many other reasons that people choose not to get vaccinated.'" *Id.* (quoting *Does 1-

2*, 632 F. Supp. 3d at 141).

The Court agrees with these analyses and applies them in the context of the influenza

vaccine.  Plaintiff has not raised a triable issue of fact concerning an inference of discrimination

because she has presented no evidence that she was fired because of her religion.  The policy

applied regardless of one's religious beliefs or practices and others who refused the influenza

vaccination were also fired.  *See* Dkt. No. 39-1 at ¶ 65; Dkt. No. 38-6 at 32-33.  Plaintiff does not

present any evidence that those who had medical contraindications were "similarly situated."

Thus, her argument concerning this different exemption does not create an inference of

discrimination.  *See Algarin*, 678 F. Supp. 3d 497, 516–17.

Plaintiff also contends that "the temporal proximity of [Plaintiff's] request for an

accommodation and her termination raises an inference of discrimination."  Dkt. No. 39 at 14.

Plaintiff's suspension and termination did not occur until after she communicated with Ms. Estey and Ms. Pierre about her "beliefs." Dkt. No. 39-1 at ¶¶ 56-64.  Plaintiff did not state on any of her prior declination forms that she was declining because of religion.  *See id.* at ¶¶ 32, 39.  Plaintiff only told her former manager about her religion in terms of requesting time off for Shabbat.  *See* Dkt. No. 38-4 at 130-31.  She was not meeting with her with her "Israelite friends" while working for Defendant.  *See id.* at 153-54. She never requested a religious exemption from another employer.  *See id.*  Ms. Estey did not know that Plaintiff practiced a specific religion.  *See* Dkt. No. 38-5 at 12, 17.  Ms. Castilla did not know of Plaintiff's religious beliefs.  *See* Dkt. No. 38-6 at 17.  Ms. Pierre did not recall if Plaintiff every mentioned the religion that she followed.  *See* Dkt. No. 38-7 at 13.

The Supreme Court has rejected an argument "that an applicant cannot show disparate treatment without first showing that an employer has 'actual knowledge' of the applicant's need for an accommodation."  *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 (2015).  "Instead, an applicant need only show that his need for an accommodation was a motivating factor in the employer's decision."  *Id.* (footnote omitted).

Nevertheless, Plaintiff has not presented any evidence that her religion was a motivating factor in Defendant's decision to suspend and terminate her.  Although her suspension and termination, respectively, were only five and twelve days after Plaintiff told Ms. Estey and Ms. Pierre that she would not get vaccinated because of her "beliefs," there is no evidence that Defendant terminated her because of beliefs that were religious in nature.  *See* Dkt. No. 39-1 at ¶¶ 56-64.

Even assuming Plaintiff had raised a triable issue of fact about causation, Defendant has provided a legitimate, non-discriminatory, non-retaliatory reason for Plaintiff's termination.  *See*

*infra* at Section E.  Accordingly, Plaintiff's disparate treatment claim is dismissed on this alternative ground.

**D.    Retaliation**

"A prima facie case of retaliation requires a plaintiff to demonstrate that '(1) [she] was engaged in protected activity; (2) the employer was aware of that activity; (3) [she] suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action.'" *Brooks*, 275 F. Supp. 3d at 380 (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)).  "'The Supreme Court has held that in the context of a Title VII retaliation claim, an adverse employment action is any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination."'" *Id.* (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015)) (additional quotation omitted). "'This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII.'" *Id.* (quotation and citation omitted).

Defendant argues that Plaintiff did not engage in protected activity because she did not request an accommodation.  *See* Dkt. No. 38-2 at 17-18.  However, as explained, there is a dispute of fact as to whether Plaintiff requested a reasonable accommodation because she testified that she communicated her religious reasons for her declination to Ms. Estey and Ms. Pierre, but they testified that she did not.  *See supra* at Section B.2.

However, Plaintiff's retaliation claim fails because she has not raised a triable issue of fact as to causation.  "The Supreme Court [has] held that a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338,

361 (2013)).  "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 846 (footnote omitted).  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.  From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.* (collecting cases).  Plaintiff has not presented any "weaknesses, implausibilities, inconsistencies, or contradictions" in Defendant's reasoning.  *Id.*

Defendant argues that "Plaintiff cannot establish a causal connection between any protected activity and her termination because the disciplinary process for Plaintiff's failure to receive the influenza vaccination began prior to Plaintiff ever disclosing that she would not receive the vaccine." Dkt. No. 38-2 at 18 (citing, *inter alia, Porter v. Potter*, 366 Fed. Appx. 195, 197 (2d Cir. 2010) ("Adverse employment actions that are part of an 'extensive period of progressive discipline' that begins prior to any protected activity on the plaintiff's part cannot give rise to an inference of retaliation sufficient to make out a prima facie case")); *see also* Dkt. No. 40 at 10 n.9.  Defendant consistently notified employees of its new mandatory influenza vaccination policy beginning in August 2019.  These notifications informed employees that failure to comply with the mandatory influenza vaccination policy by November 12, 2019, would result in suspension and further non-compliance would result in termination.  *See* Dkt. No. 39-1 at ¶¶ 51-55.  Ms. Estey personally informed Plaintiff of the consequences for non-compliance before Plaintiff ever disclosed that she would not receive the influenza vaccine.  Dkt. No. 38-2 at 18.  To be sure, although Plaintiff was informed of the repercussions for failing to get the influenza

vaccine, she was not suspended or terminated until after she told Ms. Estey and Ms. Pierre about her "beliefs." Dkt. No. 38-1 at ¶¶ 56-64.

Nevertheless, the Court agrees with Defendant that "[w]here . . . the consequences for an individual's non-compliance with a lawful employment policy . . . were established before the alleged protected activity occurred, courts routinely dismiss retaliation claims for lack of causation." *Gonzalez v. City of New York*, No. 22-CV-3577, 2024 WL 1332546, *14 (E.D.N.Y. Mar. 28, 2024) (collecting cases); *see also Sharikov v. Philips Med. Sys. MR, Inc.*, 659 F. Supp. 3d 264, 286 (N.D.N.Y. 2023) ("[The p]laintiff fails to allege facts that would allow a plausible inference of a causal connection between his protected conduct and termination. [The d]efendant's COVID-19 policy—'which was undisputedly the grounds for [the plaintiff's] termination when [he] chose to remain unvaccinated—was enacted *before* [the plaintiff] spoke up in opposition to the vaccination requirement'"); *Librandi v. Alexion Pharms., Inc.*, No. 3:22-CV-1126, 2023 WL 3993741, *8 (D. Conn. June 14, 2023) (same) (collecting cases).

Defendant created the influenza vaccine policy before Plaintiff ever spoke to Ms. Estey or Ms. Pierre about her "beliefs." The policy, as well as numerous e-mails to all staff and directly to Plaintiff, warned her of the consequences for failing to get the vaccination. Therefore, Plaintiff has not raised a dispute of fact as to whether her religion was the "but-for" cause of any retaliation. It was her failure to receive influenza vaccine. *See Sharikov v. Philips Med. Sys. MR, Inc.*, No. 23-407-CV, 2024 WL 2820927, *8 (2d Cir. June 4, 2024) ("[The plaintiff] failed to plausibly allege that but for his protected activity -- his complaints about [the defendant's] COVID-19 policies to his managers, the global ethics complaint line, and the EEOC -- he would not have been fired. The allegations of the Complaint instead make clear that [the plaintiff] was discharged because he refused to comply with the company-wide policies first announced in

October 2021, when all employees were told they had to be vaccinated or approved for an exemption by February 4, 2022 or be deemed to have resigned.  This message was sent to all employees before [the plaintiff] engaged in any protected activity"); *see also Grimes v. New York & Presbyterian Hosp.*, No. 1:23-CV-652, 2024 WL 816208, *10 (S.D.N.Y. Feb. 26, 2024) (collecting cases) (dismissing Title VII retaliation claim because "contrary to [the plaintiff's] claims that her termination and restriction from [the defendant's] systems constituted retaliation based on religious or disability animus, [the plaintiff] was expressly warned—along with all other [] employees—that noncompliance with the [] Mandate would result in these precise consequences"); *Adams v. New York State Unified Ct. Sys.*, No. 22-CV-9739, 2023 WL 5003593, *4 (S.D.N.Y. Aug. 4, 2023) (dismissing retaliation claim because the plaintiff's "own allegations establish[ed] that her religious exemption application was not a but-for cause of her termination" and that "that the cause was her non-compliance with the vaccine mandate").

Thus, Defendant's motion is granted as it relates to Plaintiff's retaliation claim.[4]

**E.    Legitimate, Nondiscriminatory, Nonretaliatory Reason for Adverse Action and Pretext**

Even assuming Plaintiff stated a *prima facie* discrimination or retaliation claim, Defendant has proffered a legitimate, nondiscriminatory, and nonretaliatory reason for terminating Plaintiff—she did not comply with the mandatory vaccination requirement and was working with hospital staff and patients.  Courts have repeatedly concluded that such a justification is

---

[4] Defendant also argues that Plaintiff's retaliation claim must be dismissed for failure to exhaust her administrative remedies.  *See* Dkt. No. 38-2 at 16-17.  Because the Court concludes that dismissal is warranted on other grounds, it need not address this issue.  *See McNeil v. Aguilos*, 107 F.3d 3, 3 (2d Cir. 1996) ("We need not address the court's alternative ground of dismissal"); *Miller v. Carrasquilla*, 830 Fed. Appx. 42, 43 (2d Cir. 2020) ("Since those rulings are by themselves sufficient independent grounds to uphold the district court, the Court need not address the Appellant's challenges to the district court's other reasons for dismissing the action").

legitimate, nondiscriminatory, and nonretaliatory.  *See Smith v. St. Joseph's Med. Ctr.*, No. 22-CV-5231, 2024 WL 2058619, *4 (S.D.N.Y. May 7, 2024) ("Assuming, without deciding, [the] plaintiff has met her de minimis burden of establishing a prima facie case of discrimination, the Court finds [the] defendants have proffered a legitimate, non-discriminatory reason for plaintiff's termination—her failure to comply with the vaccination mandate—and [the] plaintiff has not raised a triable issue of fact as to whether [the] defendants' proffered reason was merely a pretext for discrimination"); *Gower v. Yuma Senior Living LLC*, No. 22-CV-01334, 2023 WL 8455118, *4 (D. Ariz. Dec. 6, 2023) ("[The p]laintiff does not reply to these reasons, but notes he was aware that COVID spread quickly and that people died from it.  Noting these justifications, and [the p]laintiff's lack of response, the Court finds that [the defendant] had a legitimate, nondiscriminatory reason for the vaccination policy, and [the p]laintiff has failed to show it was pretextual"); *Prewitt v. Walgreens Co.*, 92 F. Supp. 3d 292, 312-13 (E.D. Pa. 2015) ("In light of the defendant's decision to make vaccinations more available at all their stores, their decision to terminate the plaintiff for refusing to immunize is a legitimate, nondiscriminatory rebuttal to the presumption of retaliatory intent"); *Truesdale v. Albert Einstein Healthcare Network*, No. CV 22-1597, 2024 WL 329931, *7 (E.D. Pa. Jan. 29, 2024) ("[E]ven if [the p]laintiff could make a prima facie case, [the d]efendants articulated a legitimate, non-retaliatory reason for the challenged employment action.  According to [the d]efendants, [the p]laintiff was terminated due to her failure to comply with the employer's policy to obtain a COVID-19 vaccination.  This policy is neutral, applies to all employees, and the consequence of termination applies to all employees who fail to get vaccinated regardless of if they choose to file an exemption request").

Plaintiff has also failed to establish that Defendant's justification is pretextual for unlawful discrimination or retaliation.  "To establish 'pretext' under Title VII, a plaintiff need only establish

that discrimination played a role in an adverse employment decision.  In other words, a Title VII

plaintiff need only prove that the employer's stated non-discriminatory reason was not the

exclusive reason for the adverse employment action.'"  *Bart v. Golub Corp.*, 96 F.4th 566, 574 (2d

Cir. 2024) (quoting *Naumovski v. Norris*, 934 F.3d 200, 214 (2d Cir. 2019)).  "[A] plaintiff

satisfies the 'pretext' requirement of *McDonnell Douglas* when he or she 'prove[s] that

discrimination played a role in motivating the adverse action taken against the plaintiff.'"  *Id.*

(quoting *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 157 (2d Cir. 2010)).  "A plaintiff [] need

only show that the employer's stated reason—even if true or factually accurate—was not the 'real

reason,' in the sense that it was not the entire reason due to a coexisting impermissible

consideration."  *Id.* (quotation omitted).  While courts have used the term "pretext" as shorthand,

the Second Circuit has "explained that a more complete characterization of a plaintiff's third-stage

burden in mixed-motives cases is to produce 'admissible evidence . . . show[ing] circumstances

that would be sufficient to permit a rational finder of fact to infer that the defendant's employment

decision was more likely than not based in whole or in part on discrimination.'"  *Id.* (quoting

*Walsh v. N.Y.C. Housing Auth.*, 828 F.3d 70, 75 (2d Cir. 2016)).

Plaintiff has not produced any evidence showing that Defendant's stated reason is false or

that her religion was the "real reason" for Defendant's decision.  Plaintiff does not even present an

argument concerning pretext.  *See generally* Dkt. No. 39.  Thus, Defendant's motion for summary

judgment concerning Plaintiff's discrimination and retaliation claims is granted and those claims

are dismissed.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the

applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 38) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  June 12, 2024
       Albany, New York

Mae A. D'Agostino
U.S. District Judge